# 𝔍𝔫 𝔱𝔥𝔢 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 ℭ𝔬𝔲𝔯𝔱 𝔬𝔣 𝔉𝔢𝔡𝔢𝔯𝔞𝔩 ℭ𝔩𝔞𝔦𝔪𝔰
## OFFICE OF SPECIAL MASTERS
No. 22-1669V

|  |  |
|---|---|
| ANGELINA DIAZ,<br><br>　　　　　　　Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>　　　　　　　Respondent. | Chief Special Master Corcoran<br><br>Filed: December 13, 2024 |

*Catherine Wallace Costigan*, Mctlaw, Washington, DC, for Petitioner.

*Meghan Murphy*, U.S. Department of Justice, Washington, DC, for Respondent.

**DECISION AWARDING DAMAGES**[1]

On November 10, 2022, Angelina Diaz filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that she suffered Guillain Barré syndrome ("GBS") as a result of an influenza ("flu") vaccine administered to her on January 9, 2020.[3] *See* Petition. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

[3] Petitioner also received a tetanus, diphtheria, and acellular pertussis vaccine on January 9, 2020. Exhibit 1, ECF No. 5-2 (vaccine record). However, Respondent's concession and my entitlement ruling was based upon Petitioner's Table claim of GBS following receipt of the flu vaccine. ECF Nos. 23-24; *see* 42 C.F.R. § 100.3(a)(XIV)(D) & (c)(15) (2017).

Masters. After Respondent conceded entitlement, the parties were unable to resolve damages on their own,[4] so I ordered briefing on the matter.

For the reasons set forth below, I find that Petitioner is entitled to an award of damages in the amount $**170,000.00 for pain and suffering.** (The parties have agreed Petitioner is also entitled to **$4,243.51 for past unreimbursed expenses, and $22,636.42 for past lost wages).**

## I.   Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and

---

[4] Approximately six months after she was determined to be entitled to compensation, Petitioner informed me that the parties had reached an impasse in their damages discussions and requested that I set a briefing schedule. Status Report, filed Feb. 20, 2024, ECF No. 33.

suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims. *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by the Court several years ago. *Graves v. Sec'y of Health & Hum. Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). The *Graves* court maintained that to do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 590. Instead, *Graves* assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id.* at 595. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap. Although *Graves* is not controlling of the outcome in this case, it provides reasoned guidance in calculating pain and suffering awards.

## II. Prior SPU Compensation of GBS Pain and Suffering[5]

### A. Data Regarding Compensation in SPU Flu/ GBS Cases

Flu/GBS cases have an extensive history of informal resolution within the SPU. As of July 1, 2024, 842 SPU GBS cases have resolved since the inception of SPU ten years before. Compensation has been awarded in the vast majority of cases (801), with the remaining 41 cases dismissed.

The data for all categories of damages decisions described above reflect the expected differences in outcome, summarized as follows:

---

[5] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to former Chief Special Master Dorsey, now Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

|  | **Damages Decisions by Special Master** | **Proffered Damages** | **Stipulated Damages** | **Stipulated[6] Agreement** |
|---|---|---|---|---|
| **Total Cases** | *51* | *376* | *17* | *357* |
| **Lowest** | $96.008.66 | $9,050.40 | $20,000.00 | $3,098.64 |
| **1st Quartile** | $154,225.96 | $127,216.71 | $155,000.00 | $100,000.00 |
| **Median** | **$170,279.32** | **$165,000.00** | **$252,000.00** | **$150,000.00** |
| **3rd Quartile** | $184,974.86 | $250,000.00 | $400,000.00 | $225,000.00 |
| **Largest** | $244,390.18 | $2,282,465.84 | $985,000.00 | $1,200,000.00 |

### B.   Adjudication Specifically of GBS Pain and Suffering

Only a small minority of cases involved a special master's adjudication of damages issues. The written decisions setting forth such determinations, prepared by neutral judicial officers (the special masters themselves), provide the most reliable guidance in deciding what similarly situated claimants should also receive.[7]

As of July 1, 2024, in nearly every occasion that SPU has had to resolve the appropriate award for GBS pain and suffering, over $100,000.00 has been awarded. A lower sum of $92,500.00 was awarded just once. The remaining forty-nine (49) awards far exceeded $100,000.00. The first-quartile value is $151,250.00. The median is $165,000.00. The third-quartile value is $177,250.00. The largest award was $192,500.00.

These decisions are informed by information about GBS, including the description contained in the Vaccine Injury Table ("Table"). Pursuant to the Table, vaccine causation is presumed for GBS with an onset 3 – 42 days (not less than 3 days, and not more than 42 days) after receipt of a seasonal flu vaccine. 42 C.F.R. § 100.3(a)(XIV)(D). The Qualifications and Aids to Interpretation ("QAI") explain:

> GBS is an acute monophasic peripheral neuropathy that encompasses a spectrum of four clinicopathological subtypes… The interval between the

---

[6] One award was for an annuity only, the exact amount which was not determined at the time of judgment.

[7] Of course, even though *all* independently-settled damages issues (whether by stipulation/settlement or proffer) must still be approved by a special master, such determinations do not provide the same judicial guidance or insight obtained from a reasoned decision. But given the aggregate number of such cases, these determinations nevertheless "provide *some* evidence of the kinds of awards received overall in comparable cases." *Sakovits v. Sec'y of Health & Hum. Servs.*, No. 17-1028V, 2020 WL 3729420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020) (discussing the difference between cases in which damages are agreed upon by the parties and cases in which damages are determined by a special master).

4

> first appearance of symptoms and the nadir of weakness is between 12 hours and 28 days. This is followed in all subtypes by a clinical plateau with stabilization at the nadir of symptoms, or subsequent improvement without significant relapse. Death may occur without a clinical plateau. Treatment-related fluctuations in all subtypes of GBS can occur within 9 weeks of GBS symptom onset, and recurrence of symptoms after this timeframe would not be consistent with GBS.

42 C.F.R. § 100.3(c)(15)(I) (2017). The three most common subtypes are acute inflammatory demyelinating polyneuropathy ("AIDP"); acute motor axonal neuropathy ("AMAN"); and acute motor and sensory neuropathy ("AMSAN"). Id. The onset of each is marked by "bilateral flaccid limb weakness and decreased or absent deep tendon reflexes in weak limbs." Id. at (c)(15)(II). The fourth subtype – Fisher syndrome or Miller-Fisher syndrome – has a different onset of "bilateral ophthalmoparesis; bilateral reduced or absent tendon reflexes; [and] ataxia." *Id.* at (c)(15)(III).[8]

A consistent starting consideration is that "GBS pain and suffering awards generally should be higher than those awarded to petitioners who have suffered a less frightening and physically alarming injury, such as SIRVA."[9] *Gross v. Sec'y of Health & Hum. Servs.*, No. 19-0835V, 2021 WL 2666685, at *5 (Fed. Cl. Spec. Mstr. March 11, 2021); *see also, e.g.*, *Castellanos v. Sec'y of Health & Hum. Servs.*, No. 19-1710V, 2022 WL 1482497, at *10 (Fed. Cl. Spec. Mstr. Mar. 30, 2022) (emphasizing recognition of "the seriousness of GBS as a general matter," in awarding a six-figure sum); *Voeller v. Sec'y of Health & Hum. Servs.*, No. 20-1526V, 2023 WL 5019830, at *10 (Fed. Cl. Spec. Mstr. July 6, 2023) (noting GBS's "frightening" nature).

But of course, not every GBS case is equally severe. Further details of the initial medical course are considered – including any mistake or delay in diagnosing GBS; any in-patient hospitalization and/or in-patient rehabilitation (and the duration of any such stays); diagnostic procedures (e.g., bloodwork, lumbar punctures, electrodiagnostic studies, imaging); the severity of symptoms at their nadir (e.g., involving incontinence or respiratory failure); the extent and effectiveness of treatment (e.g., IVIg, plasmapheresis,

---

[8] *See also National Vaccine Injury Compensation Program: Revisions to the Vaccine Injury Table – Notice of Proposed Rulemaking*, 80 Fed. Reg. 45132, at 45144 – 45 (July 29, 2015) (proposing addition of Table flu/GBS claims – explaining GBS is "an acute paralysis caused by dysfunction in the peripheral nervous system [that…] may manifest with weakness, abnormal sensations, and/or abnormality in the autonomic (involuntary) nervous system," and that death, when it occurs, is most often related to respiratory failure).

[9] Shoulder injury related to vaccine administration ("SIRVA") is another Table injury. 42 C.F.R. §§ 100.3(a), (c)(10).

pain medications); other interventions (e.g., feeding tubes, breathing tubes, catheterization); and any complications (e.g., sepsis during hospitalization).

Also relevant is the long-term course – as evidenced by out-patient therapies, neurology evaluations, and other medical appointments concerning GBS; the results of repeat electrodiagnostic studies and other relevant tests; medical providers' assessments of the degree of recovery achieved; ongoing reliance on assistive devices and medications; and relevant treatment gaps. Previous opinions have recognized that "a substantial recovery does not mean that [an individual] has fully recovered from his GBS and has no ongoing sequelae. It is common for petitioners to experience ongoing symptoms of GBS, such as numbness and fatigue, even with a good recovery." *Elenteny v. Sec'y of Health & Hum. Servs.*, No. 19-1972V, 2023 WL 2447498, at *5 (Fed. Cl. Spec. Mstr. Mar. 10, 2023). But symptoms of that nature are typically folded into a "typical" past pain and suffering award, and will not justify a future component. *See, e.g., id.*; *Miller v. Sec'y of Health & Hum. Servs.*, No. 21-1559V, 2023 WL 2474322, at *8 (Fed. Cl. Spec. Mstr. Feb. 10, 2023).

"The mere fact that a claimant had pre-vaccination comorbidities does not *per se* diminish the impact of [the vaccine injury] on his life – especially one as alarming and potentially life-altering as GBS – and therefore is not alone reason for a lower award." *Bircheat v. Sec'y of Health & Hum. Servs.*, No. 19-1088V, 2021 WL 3026880, at *4 (Fed. Cl. Spec. Mstr. June 16, 2021). However, a special master is statutorily required to consider to what extent a petitioner's pain and suffering is truly "*from* the vaccine-related injury," Section 15(a)(4) (emphasis added), and not from any unrelated preexisting or subsequently-developed medical issues. *See, e.g.*, *Bircheat*, 2021 WL 3026880, at *4; *Gross*, 2021 WL 2666685, at *5.

Also worthy of consideration are the injury's impact on a petitioner's personal circumstances including his or her family and other personal obligations, and professional life (whether or not lost wages are directly claimed).

All of these facts are primarily gleaned from the medical records – although sworn statements and/or other evidence may also be considered, especially if they *supplement*, and do not contradict, the facts reflected in the medical records.

### III.    The Parties' Arguments

The parties agree that Petitioner is entitled to $4,243.51 for past unreimbursed medical expenses, and $22,636.42 for past lost wages. Petitioner's Memorandum in Support of Motion for Findings of Fact and Conclusions of Law Regarding Damages ("Pet. Brief") at 2, ECF No. 37; Respondent's Brief on Damages ("Res. Brief") at 11, ECF No.

39; Petitioner's Reply to Res. Brief ("Pet. Reply") at 5, ECF No. 40. Thus, the only area of disagreement is related to Petitioner's award for past pain and suffering.

Emphasizing the view I have expressed in other decisions that pain and suffering awards in GBS cases should be greater than average (due to the nature of GBS as an alarming and unexpected vaccination adverse event),[10] Petitioner argues that she is entitled to a past pain and suffering award of $180,000.00. Pet. Brief at 15, 20; Pet. Reply at 5. She favorably compares the duration of her hospital stay, inpatient rehabilitation, continued medication, and overall duration of her GBS symptoms to those aspects of the *Fedewa, Johnson,* and *T.M.* cases[11] – all involving awards of $180,000.00. Pet. Brief at 16-20. Petitioner further insists that, like the *Fedewa* petitioner, she experienced a delay in treatment due to the misinterpretation of her symptoms. *Id.* at 16-17. Additionally, she contrasts her longer leave of absence from work with the shorter period needed by the *T.M.* petitioner. *Id.* at 20.

Respondent counters that $135,000.00 is an appropriate amount for Petitioner's past pain and suffering. Res. Brief at 1, 11. Emphasizing the symptom improvement Petitioner experienced at different points during the initial six months of her GBS illness (*id.* at 7-9), he maintains that she "suffered from a more moderate course of GBS." *Id.* at 8.

Although he did not provide any comparable cases in defense of his proposed award, Respondent argues that the facts and circumstances of Petitioner's case are distinguishable from her proposed comparables. Res. Brief at 8-10. He emphasizes the *Johnson* petitioner's inability to walk unassisted or drive for four months and the substantial physical therapy she required. *Id.* at 8-9. Positing that Petitioner's initial emergency room visits, and receipt of medications commonly prescribed for neuropathic pain, were partially attributable to her cervical pain, Respondent maintains that the *Fedewa* petitioner's diagnostic delay and need for ongoing medication and treatment was more significant. *Id.* at 9-10. Regarding the *T.M.* petitioner's circumstances, he cites her concurrent carpal tunnel diagnosis, separation from her husband, and longer symptom duration (four years). *Id.* at 10.

---

[10] Pet. Brief at 15 (citing *Gross v. Sec'y of Health & Hum. Servs.,* No. 19-0835V, 2021 WL 2666685, at *5 (Fed. Cl. Spec. Mstr. Mar. 11, 2021)). As I stated in *Gross,* "it is my view that GBS pain and suffering awards generally should be higher than those awarded to petitioners who have suffered a less frightening and physically-alarming injury, such as SIRVA." 2021 WL 2666685, at *5.

[11] *Fedewa v. Sec'y of Health & Hum. Servs.*, No. 17-1808V, 2020 WL1915138 (Fed. Cl. Spec. Mstr. March 26, 2020); *Johnson v. Sec'y of Health & Hum. Servs.,* No. 16-1356V, 2018 WL 5024012 (Fed. Cl. Spec. Mstr. July 20, 2018); *T.M. v. Sec'y of Health & Hum. Servs.,* No. 19-0911V, 2023 WL 355358 (Fed. Cl. Spec. Mstr. Jan. 23, 2023).

7

On reply, Petitioner challenges Respondent's characterization of her GBS illness as moderate, and criticizes his failure to provide any comparable cases to support the pain and suffering amount he proposes. Pet. Reply at 1. Countering Respondent's arguments regarding the comparable cases she proposed, Petitioner emphasizes that, like the *Johnson* petitioner, she required significant PT and was unable to drive for four months post-hospitalization. *Id.* at 2-3. She contends her neuropathic pain medication was first prescribed during her GBS illness, and thus not intended solely or partially for treatment of concurrent cervical pain. *Id.* at 4. And she discounts Respondent's argument that the *T.M.* petitioner's carpal tunnel syndrome was a complicating factor, emphasizing that it was not connected to that petitioner's GBS. *Id.* at 4-5.

### IV.     Appropriate Compensation for Petitioner's Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact her awareness of her injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

In performing this analysis, I have reviewed the record as a whole, including the medical records, affidavits, and all assertions made by the parties in written documents. I considered prior awards for pain and suffering in both SPU and non-SPU GBS cases and rely upon my experience adjudicating these cases.[12] However, I ultimately base my determination on the circumstances of this case.

The evidence shows that Petitioner – age 64 when vaccinated - suffered a moderate GBS illness, involving common symptoms such as weakness, numbness, tingling, and neurologic pain in her extremities, causing difficulties with her gait and balance.[13] She obtained good symptom relief from two five-day hospitalizations, an intervening eight-day inpatient rehabilitation, IVIG therapy (two five-days courses and two maintenance treatments), prescribed medication, and occupational and physical therapy

---

[12] Statistical data for all GBS cases resolved in SPU by proffered amounts from inception through July 1, 2024 reveals the median amount awarded to be $165,000.00. The awards in these cases - totaling 376, have typically ranged from $126,711.56 to $250,000.00, representing cases between the first and third quartiles and awards comprised of all categories of compensation – including lost wages. 41 cases include the creation of an annuity to provide for future expenses.

The awards in SPU GBS cases involving substantive decisions - totaling 51, have typically ranged from $155,493.30 to $185,500.00, representing cases between the first and third quartiles, with a median amount of $170,558.64. The median amount of the past pain and suffering component was $165,000.00, with amounts falling within the first and third quartiles - $152,500.00 to $179,000.00.  Only two of these cases involved future pain and suffering awards.

[13] Throughout the medical records, Petitioner's treating physicians characterize her symptoms as mild to moderate. *E.g.,* Exhibit 5 at 439.

8

("OT" and "PT"). By November 2020, approximately ten months post-vaccination, her symptoms were mild and well-controlled by medication. Thereafter, her treatment focused on symptoms likely related to her prior and unrelated back condition, as well as any residual GBS sequela.

Petitioner first sought treatment for her GBS illness in late January 2020, when she visited the emergency room ("ER") on two occasions, complaining of lower back pain. Exhibit 5 at 1432, 1362 (ER visits on January 28th and 30th, respectively). Likely due in part to her history of multilevel degenerative disc disease and symptom description, Petitioner was diagnosed with lower back (lumbar) strain, muscle spasms, and chronic pain exacerbation. Exhibit 5 at 1364-68, 1432-34. Respondent argues that these initial symptoms may not have been GBS-related (*see* Res. Brief at 9), but this argument is undermined by the description Petitioner provided at her second ER visit - "occasionally shooting, stabbing, pain down her legs and her fingertips get tingly," characterized as "the worst episode yet" (Exhibit 5 at 1364). Still, these symptoms were not severe, and Petitioner reported no balance or gait difficulties during those initial ER visits. *Id.* at 1358-1442.

Petitioner's symptoms progressed, and she returned to the ER a third time on February 9, 2020, reporting difficulties standing and walking, as well as three falls during the previous week. *E.g.,* Exhibit 5 at 898, 923, 938; Exhibit 6 at 151-52, 362. Because all her symptoms could not be attributed to her prior back issues, Petitioner was referred to neurology and underwent an EMG. Exhibit 5 at 937; *see* Exhibit 4 at 62 (EMG results). She was diagnosed with GBS and attended OT and PT during her hospitalization and inpatient rehabilitation. Exhibit 6 at 42 (diagnosis); Exhibit 5 at 1007, 1012; Exhibit 6 at 122 (describing the ordered OT and PT). Although she briefly required a wheelchair while hospitalized, Petitioner was walking with a cane and rolling walker by her discharge from inpatient rehabilitation on February 22, 2020, less than a month after symptom onset. Exhibit 6 at 152.

On February 17, 2020, while at the inpatient rehabilitation facility, Petitioner began to experience pain in her upper extremities as well. Exhibit 6 at 282. In response, she was prescribed medication specific for treatment of neuropathic pain. Exhibit 6 at 282.

Two days after her discharge, Petitioner attended an appointment with her neurologist, reporting no worsening of her pain but continued balance and gait difficulties, as well as numbness in her feet. Exhibit 4 at 23. Following the neurologist's instructions, she presented to the ER the following day for a 5-day course of IVIG therapy. Exhibit 5 at 412, 418, 420-21, 436. Petitioner received her last IVIG treatment on February 29, 2020. *Id.* at 435.

9

By her second out-patient PT session on March 26th (and the last before her break in treatment due to the COVID Pandemic), Petitioner reported pain at a level of three out of seven, some tingling in her hands, left-sided leg weakness, but improved sensation in her feet. Exhibit 8 at 67; *see also id.* at 71 (self-discharge on April1, 2020). Although unable to work, drive, or stand and walk for more than ten minutes, Petitioner was able to dress herself and needed only a cane for support. *Id.* at 67-68.

Even though not attending PT, Petitioner continued to receive IVIG therapy at her home, a five-day course in April 2020, and four additional maintenance treatments in May and June 2020. Exhibit 11 at 22-90. When seen by her neurologist on June 17, 2020, approximately five months post-vaccination, Petitioner reported slow improvement from recent IVIG therapy. Exhibit 3 at 263. Although walking without assistance (using a cane only as needed), Petitioner complained of numbness and tingling in her hands and neck pain that radiated to the top of her head. *Id.* It appears that she returned to work during this time. Pet. Brief at 20 (stating Petitioner returned to work approximately eight months after her GBS onset and diagnosis).

In February, June, and October 2021, Petitioner attended follow-up neurology appointments. Exhibit 4 at 4-11. At the first of these appointments, she reported stable and improved symptoms. *Id.* at 9. Although she described some foot pain at her next appointment in June, it was noted that she was not taking her Gabapentin. *Id.* at 7. At her November appointment, the neurologist ordered additional lumbar and cervical imaging, and instructed Petitioner to continue taking Gabapentin. *Id.* at 5.

In January 2022, Petitioner fell and fractured her right ankle, and underwent surgery to treat this injury. Exhibit 5 at 236, 239-42. At a virtual health appointment with her primary care provider on March 11, 2022, Petitioner's GBS was now characterized as stable under her current medication plan. Exhibit 3 at 38.

After a one-year gap in treatment, Petitioner returned to the neurologist in November 2022. Exhibit 13 at 93. The neurologist noted that Petitioner was taking Gabapentin and testing had revealed some moderate cervical stenosis. *Id.* Petitioner continued to attend follow-up appointments for both her GBS and cervical issues as recently as July 2024. Exhibits 13-18.

Even though Petitioner's ongoing symptoms were mild, well-controlled with medication, and may have partially been associated with her back issues, the amount proposed by Respondent is too low considering Petitioner's ongoing need for neuropathic pain medication. Still, Petitioner clearly suffered from an unrelated co-morbidity - significant lower back pain, which required that she be placed on light duty as a U.S. postal service mail sorter for three years prior to her GBS illness. And her treating

physicians appear to attribute at least some of her symptoms to this unrelated prior condition.

Although the comparable cases Petitioner cited offered reasonable guidance, Petitioner's past pain and suffering award should be lower than the $180,000.00 awarded in those cases. For example, Petitioner argues that her pain and suffering award should be greater due to a delay in diagnosis, like that experienced by the *Fedewa* petitioner, but there are factors which heightened the *Fedewa* petitioner's initial suffering that are not present in Petitioner's case. At one point, the *Fedewa* petitioner "fell in his yard and was unable to get up until his family returned home and found him on the ground, crying and scared." *Fedewa,* 2020 WL1915138, at *2. And he suffered painful complications when undergoing a lumbar puncture and EMG testing. *Id.* These events, as well as discomfort he experienced during IVIG treatment, caused the *Fedewa* petitioner to suffer anxiety and depression severe enough to warrant medication. *Id.* at *3-4. Thus, it was not the slight delay in diagnosis (a common occurrence in many GBS cases)[14] that warranted a slightly higher pain and suffering award in *Fedewa*, but these accompanying difficulties.

Instead, I find that several other cases - *Dylla, Merchant,* and *Enstrom,*[15] all involving a pain and suffering award of $170,000.00 - offer better comparable cases. All featured relatively short hospitalizations, IVIG therapy, similar inpatient and/or outpatient therapy, and symptoms which continued for years. *Dylla,* 2024 WL 1435504, at *3-4; *Enstrom,* 2023 WL 345657, at *2-6; *Merchant,* 2022 WL 17819548, at *2-3. Petitioner should be awarded the same amount as these petitioners - $170,000.00 for her pain and suffering.

## Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I find that $170,000.00 represents a fair and appropriate amount of compensation for Petitioner's past/actual pain and suffering.[16]**

---

[14] Petitioners suffering from GBS are often sent home with incorrect diagnoses prior to receiving an accurate GBS diagnosis. *E.g., Enstrom v. Sec'y of Health & Hum. Servs.*, No. 20-2020V, 2022 WL 345657, at *2-3 (Fed. Cl. Spec. Mstr. Dec. 16, 2022); *Wilson v. Sec'y of Health & Hum. Servs.*, No. 20-0588V, 2021 WL 5143925, at *1-2 (Fed. Cl. Spec. Mstr. Oct. 5, 2021).

[15] *Dylla v. Sec'y of Health & Hum. Servs.*, No. 21-2310V, 2024 WL 1435504 (Fed. Cl. Spec. Mstr. Feb. 27, 2024); *Enstrom v. Sec'y of Health & Hum. Servs.*, 2023 WL 345657; *Merchant v. Sec'y of Health & Hum. Servs.,* No. 20-0450V, 2022 WL 17819548 (Fed. Cl. Spec. Mstr. Nov. 7, 2022).

[16] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

**I therefore award Petitioner a lump sum payment of $<u>196,879.93</u> representing compensation in the amounts of $170,000.00 for pain and suffering, $4,243.51 for actual unreimbursable expenses, and $22,636.42 for actual lost wages in the form of a check payable to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a).

The Clerk of the Court is directed to enter judgment in accordance with this Decision.[17]

**IT IS SO ORDERED.**

                                                **<u>s/Brian H. Corcoran</u>**
                                                Brian H. Corcoran
                                                Chief Special Master

---

[17] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.